## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TEXARKANA DIVISION

| | | |
|---|---|---|
| **ALBERT WRIGHTNER** | § | |
| | § | |
| **PLAINTIFF** | § | |
| | § | |
| **vs.** | § | **CIVIL ACTION NO. _____** |
| | § | |
| **SOUTHWESTERN CORRECTIONAL, LLC** | § | |
| **d/b/a LASALLE CORRECTIONS, LLC and** | § | |
| **LASALLE SOUTHWEST CORRECTIONS;** | § | |
| **LASALLE MANAGEMENT COMPANY,** | § | |
| **LLC; BOWIE COUNTY, TEXAS;** | § | |
| **VERNON BOWMAN, M.D., Individually,** | § | |
| **ASHLEY SPIVEY, Individually; MELISSA** | § | |
| **GATLIN-DEAN, Individually; JOHN and** | § | |
| **JANE DOES 1 - 10** | § | |
| | § | |
| **DEFENDANTS** | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

## I.
## INTRODUCTION

1.     This is a civil rights action brought pursuant to 42 U.S.C. § 1983 and for negligence

arising from events that occurred during the confinement of Albert Wrightner at the Bi-State Jail and

a related facility known as the Annex, which are run by the same private, for-profit correctional

healthcare corporation: LaSalle Corrections. The immediate events giving rise to this lawsuit began

on September 26, 2020, and culminated in Mr. Wrightner losing his eyesight while in the jail.

Defendants caused his blindness and resulting permanent loss of visual acuity by violating his rights

under the Eighth and Fourteenth Amendments to the United States Constitution.

2.     Defendants' unconstitutional actions include denying Albert Wrightner vital

prescription medications, failing to monitor and treat his medical conditions, including diabetes,

high blood pressure and high cholesterol, failing to timely transport him to the hospital, refusing to follow recommendations by medical staff at Wadley Regional Medical Center that Wrightner receive immediate advanced ophthalmological care at another facility, and housing Wrightner in deplorable and inhumane conditions of confinement. Defendants' actions and inactions caused him to lose his eyesight, and to suffer from a permanent loss of visual acuity and headaches.

3.    As this Court is well aware, the failure to provide even basic medical care to Wrightner at the Bi State Jail/Bowie County Correctional Center is not an isolated incident. This Court has already resolved a number of death cases arising out of this particular jail in the past seven years. Each of these deaths resulted from the customs, practices and policies of a greedy corporate culture which views detainees and inmates as potential profit, which is inexplicably valued over human life. Time and time again LaSalle neglected and abused detainees suffering from easily treatable medical conditions, thereby disregarding their fundamental constitutional rights and engaging in gross deviations from the standard of care. Despite the string of needless deaths of multiple citizens, LaSalle refuses to fix the systemic constitutional deficiencies causing them. While LaSalle no longer operates the Annex and Bi-State Justice Center it continues to operate other facilities throughout the south. According to its website, LaSalle currently houses some 13,000 citizens in several states. So long as the corporation continues to profit from the warehousing of humans, nothing changes. This case, like others filed in this Court, exemplifies everything that is wrong with the privatization of America's jails and the warehousing of human beings for profit.

## II.
## JURISDICTION AND VENUE

4.    This Court has original subject matter jurisdiction over the plaintiff's civil rights claims under 42 U.S.C. § 1983, pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. §

1343 (civil rights).

5.    This Court has personal jurisdiction over each of the named defendants because (1) they either reside in this judicial district, or (2) have sufficient minimum contacts in the State of Texas, and the exercise of personal jurisdiction would not offend traditional notions of fair play and substantial justice.

6.    Venue is proper in this Court pursuant to 28 U.S.C. 1391 (b) in that a substantial part of the events or omissions giving rise to the claim occurred in this judicial district and/or because all defendants are subject to this Court's personal jurisdiction in this action.

### III.
### PARTIES

**A.    <u>Plaintiff</u>**

7.    Plaintiff Albert Wrightner is a United States citizen and resident of Texarkana, Texas.

**B.    <u>Defendants</u>**

**1.    The Municipal Defendant**

8.    Defendant Bowie County is a governmental entity and a political subdivision of the State of Texas and is a "person" for purposes of 42 U.S.C. § 1983. Bowie County is responsible for operating the Bi-State Justice Center Jail ("Bi-State Jail"), which sits on the border of Texas and Arkansas in Texarkana and is physically located on both sides of the state line. Bowie County is also responsible for operating a related facility, known as the Annex, which sits on the Texas side of the border. All Bi-State Jail and Annex inmates are entitled to constitutional protections under the Eighth and Fourteenth Amendments, including the right to constitutionally adequate medical care. Bowie County has a non-delegable duty to ensure that the Bi-State Jail and the Annex meet constitutional mandates. Bowie County may be served via its County Judge, the Honorable Bobby

Howell, at 710 James Bowie Drive, New Boston, Texas 75570.

9.      In February 2013, and as periodically renewed thereafter, Defendant Bowie County contracted with a private, for-profit correctional corporation, known as Southwestern Correctional, LLC, d/b/a LaSalle Corrections, LLC, to run all aspects of the Bi-State Jail and the Annex, including the provision of medical care to the jail's population of pretrial detainees and post-conviction prisoners. Pursuant to the contract, Bowie County is obligated to conduct monthly inspections of the Bi-State Jail. Although Defendant Bowie County sought to privatize the operation of their jail by delegating its final policy-making authority to Southwestern Correctional, LLC, it cannot contract-away its constitutional obligations and is liable for any unconstitutional corporate customs or policies that resulted in harm to any detainees and inmates confined in the jail.

### 2.      The Corporate Defendants

10.     Defendant Southwestern Correctional, LLC, d/b/a LaSalle Corrections, LLC and LaSalle Southwest Corrections (hereinafter "LaSalle"), is a Texas Limited Liability Company doing business in this judicial district for purposes of profit. LaSalle is considered a "person" under 42 U.S.C. § 1983. LaSalle manages the day-to-day operations of the Bi-State Jail and the Annex. LaSalle is a final policymaker for Bowie County for purposes of providing jail-related services and meeting the needs of its pretrial detainees and convicted inmates. According to the Texas Secretary of State, LaSalle's registered agent is Tim Kurpiewski at 26228 Ranch Road 12, Dripping Springs, Texas 78620. At all material times, this defendant was acting under color of state law. Regardless of its place of residence, the allegations against this defendant arise from its actions in the state of Texas and in this judicial district.

11.    Defendant LaSalle Management Company, LLC ("LaSalle Management") is a Louisiana Limited Liability Company doing business in this judicial district for the purpose of profit. LaSalle Management is considered a "person" under 42 U.S.C. § 1983 and is the parent company of LaSalle. It is responsible for ensuring that its subsidiary meets its constitutional obligations in running the Bi-State Jail and the Annex. Because LaSalle Management does not maintain a registered agent in the State of Texas, it may be properly served through the Texas Secretary of State via certified mail at Secretary of State, P.O. Box 12079, Austin, Texas 78711. The Texas Secretary of State is then requested to forward service to LaSalle Management's registered agent in Louisiana: William K. McConnell, 192 Bastille Lane, Suite 200, Ruston, Louisiana 71270. At all material times, this defendant was acting under color of state law. Regardless of its place of residence, the allegations against this defendant arise from its actions in the state of Texas and in this judicial district.

**3.    The Individual Defendants**

12.    Defendant Vernon D. Bowman, M.D. is a United States citizen who, on information and belief, resides in Texas. Defendant Bowman was an agent, employee and/or subcontractor of Defendant LaSalle and was responsible for providing correctional medical care to detainees at the Bi-State Jail and Annex, including Albert Wrightner. At all material times, Defendant Bowman was a policymaker for LaSalle and was acting under color of state law. Regardless of his place of residence, the allegations against this defendant arise from his actions in the state of Texas and in this judicial district.

13.    Defendant Ashley Spivey is a United States Citizen who, on information and belief, resides in Texas. Defendant Spivey was an agent, employee and/or subcontractor of Defendant

LaSalle and was responsible for providing correctional medical care to inmates and detainees, including Albert Wrightner. At al material times, he was acting under color of state law. Regardless of her place of residence, the allegations against this defendant arise from her actions in th state of Texas and in this judicial district.

14.     Defendant Melissa Gatlin-Deal is a United States citizen who, on information and belief, resides in Texas. Defendant Gatlin-Deal was an agent, employee and/or subcontractor of Defendant LaSalle, and was responsible for providing correctional medical care to detainees and inmates, including Albert Wrightner. At all material times she was acting under color of state law. Regardless of her place of residence, the allegations against this defendant arise from her actions in the State of Texas and in this judicial district.

15.     Defendants John and Jane Does 1-10 are United States citizens who reside either in Texas or Arkansas. These defendants (whose identities are unknown) were agents, employees and/or subcontractors of Defendant LaSalle and were responsible for providing medical care and/or other jail-related services to inmates and detainees, including Albert Wrightner. At all material times they were acting under color of state law. Regardless of their places of residence, the allegations against these defendants arise from their actions in the state of Texas and in this judicial district.

## IV.
## FACTUAL ALLEGATIONS

### A.    <u>Facts Applicable to All Defendants</u>

16.     On or about September 25, 2020 Plaintiff Albert Wrightner was preparing to camp with his sons on the government owned facility known as the Red River Army Depot in Bowie County, Texas. Officials at the gate ran a check on Wrightner's driver's license, which turned up

a warrant from years past.[1] The Bowie County Sheriff's Office was notified and deputies were dispatched to the Red River Army Depot. Once there, deputies arrested Wrightner on the old warrant and transported him to the Bi-State Justice Center. Wrightner was booked into the jail on the morning of September 26, 2020.

17.    Wrightner, like millions of other Americans, suffered from hypertension, diabetes and high cholesterol. He had been prescribed and was taking five commonly prescribed medications to treat his high blood pressure, diabetes and high cholesterol. These medications included:

a.    MetFormin HCL - MetFormin controls high blood sugar and helps prevent a number of diabetic complications, including blindness associated with diabetes;

b.    Losartan Potassium - This medication treats high blood pressure by relaxing blood vessels so blood flows more easily;

c.    Atorvastatin CA - This medication lowers bad cholesterol and triglycerides;

d.    Amlodipine - A calcium channel blocker, this medication helps control high blood pressure by relaxing blood vessels; and

e.    Hydrochlorothiazide - A diuretic, this medication is also given to treat high blood pressure.

Left untreated, both diabetes and high blood pressure can lead to vision loss. Thus, it was important to Mr. Wrightner that he continue receiving his medications while in custody. It was also important that Defendants provide medical services to Wrightner once they were made aware of his medical conditions and his need for his daily medications.

18.    As part of the booking process on the morning of September 6, 2020 at approximately 9:05 a.m. Mr. Wrightner underwent a medical intake interview. Wrightner was asked a series of medical related questions by jail nurse Janna Poole-Brescia, L.P.N. Ms. Brescia, accurately recorded

---

[1]  The charge on which the warrant was based was ultimately dismissed.

that Wrightner suffered from diabetes, hypertension and high cholesterol. At intake Wrightner's blood pressure reading was 191/125, which is high. Wrightner was not provided with any medications at that time. During that same intake process Wrightner identified all of his medications to Brescia, who recorded on the medical intake screening form that Wrightner was taking medications, including Metforman, Norvasc (generic for Amlodipine), hydrochlorothiazide and Simvastin (generic for Atorvastatin) for his medical conditions. Thus, correctional and medical staff were informed at the inception of his incarceration of Wrightner's medical conditions and the medications he needed to treat those conditions. LaSalle medical policies and protocols required that Wrightner be placed on blood sugar and blood pressure monitoring. The same policies and protocols also required that the Intake Screening Form, which contains the listings of his medical conditions and medications, become part of Wrightner's medical file.

19.      Wrightner also executed a consent form during the intake process on the morning of September 26, authorizing LaSalle medical staff to provide him medical services. Armed with the knowledge that Wrightner suffered from these conditions, was taking five different daily medications to treat them and that LaSalle had the responsibility for providing medical treatment to Wrightner, LaSalle should have immediately secured orders from its medical director to start Wrightner on the same or similar medications he took before his arrest. It did not. The screening nurse, Ms. Poole-Brescia is a licensed practical nurse with a very limited scope of practice. She is not allowed by law to make diagnoses or prescribe medications. Rather, she is a gatekeeper, responsible for consulting more advanced medical practitioners for actual diagnosis and treatment decisions. She recognized the importance of promptly getting Wrightner back on his medications, as she immediately faxed a request for medications to his pharmacy the morning of the 26th. Had

medical staff acted reasonably, medical director Vernon D. Bowman, M.D. would have been consulted on the 26th of September so replacement medications promptly supplied to Wrightner. This was subsequently done, but a week too late, and only after Wrightner suffered an almost complete loss of vision in both eyes. During the critical seven days between September 26th and October 3rd, nothing was done by medical staff to secure and administer these critical medications. As a result of these failures, Wrightner's blood pressure increased over time, resulting in him only being able to see shapes and limited colors. He now suffers a permanent loss of visual acuity.

20.    Because he suffered from diabetes and high blood pressure, LaSalle's medical protocols and medical practice standards required that Wrightner undergo daily blood sugar and blood pressure checks. Those same protocols and policies required all nursing staff to record Wrightner's blood sugar and blood pressure, and to maintain those readings as part of Wrightner's medical file.

21.    Ms. Brescia faxed a request for a list of Wrightner's current medications and dosages to his pharmacy (Super One) that same morning. But no member of the medical staff at the jail prepared a list of medications for him. After classifying Wrightner as non-violent, jail staff placed him in N-pod, which is a dorm style pod for low risk detainees.

22.    On September 28, 2020 (day 2 of his incarceration) Wrightner was transferred to the Annex, a separate jail facility located two blocks from the Bi-State Justice Center in Texarkana, Bowie County, Texas. He was placed in housing on Delta Deck in the Annex. Transfer documents prepared by LaSalle correctional and medical staff indicate that no medication list or medication administration record ("MAR") were included in Wrightner's records as required by LaSalle policies and protocols. This is further evidence that Wrightner was not provided with any of his medications

and had not had his blood pressure checked as required by LaSalle medical procedures and protocols. In fact, Wrightner's blood pressure was taken only twice during the first week of his incarceration, once at intake on September 26th and the second on September 28th. Nursing staff at the Annex had access to Wrightner's medical file at all material times. Any competent nurse should have realized the Annex was receiving a hypertensive, diabetic patient with high cholesterol who had not received a sufficient number of blood pressure checks since he was booked in two days earlier. Nor had he received any medications.

23.    Wrightner informed the nurse on duty at the Annex when he was transferred on September 28, 2020 that he needed his meds. The nurse, charged with providing medical care to Wrightner, stated that his medications would be provided, but then ignored his request, ignored the fact that there was no record of Wrightner receiving any of his medications for the conditions listed on his intake forms and ignored the fact that there had been an insufficient number of blood pressure checks thus far during his incarceration. The nurse also failed to measure any of Wrightner's vital signs, including his blood pressure, even after Wrightner told her he needed them.

24.    The medical file which accompanied Wrightner to the Annex contained ample information that he suffered from hypertension, diabetes and high cholesterol, was on numerous medications for those conditions and that he had NOT received any medications since his intake. LaSalle medical policies and protocols require the prompt administration of medications, daily blood sugar and blood pressure checks for patients who suffer from diabetes and/or high blood pressure. Despite all this information, Wrightner received no medications and an inadequate number of blood pressure checks. His blood pressure remained untreated and unmeasured for five more days between his transfer to the Annex on September 28, 2020 and the morning of October 3, 2020.

25.    Nursing staff work twelve hour shifts at the Bi-State/Annex, typically working shifts from 5:00 a.m. to 5:00 p.m. (or vice versa). Once Wrightner was placed in the Annex on September 28, 2020, there was essentially no medical services provided. He wasn't given any medications and underwent no blood pressure checks. He never even had his vital signs taken between September 28 and October 3, 2022. Each and every nurse assigned to the Annex failed to follow LaSalle protocols, standing orders of the medical director and applicable standards of medical care. This includes the named Defendant nurses and some of the Doe Defendants. No advanced practitioners, including the jail's medical director were consulted by nursing staff.

26.    Between September 28 and October 3 Wrightner began experiencing blood pressure related headaches, primarily behind his left eye. He had also begun experiencing a decrease in visual acuity and experienced blurred and double/triple vision. He voiced his symptoms and his ongoing need for his medications to medical staff on duty, who continued to ignore his medical needs and provided no medications to Wrightner for any of his medical conditions for those five days. Nor did the nursing staff consult a higher level provider about Wrightner's symptoms or the fact that he had been without all five of his medications since his intake a week earlier.

27.    By the morning of October 3, 2022 Wrightner's headaches and decreased vision/double vision had worsened. Wrightner was also experiencing body aches and vomiting. He requested that the nurse on duty take his blood pressure. Defendant Melissa Gatlin-Deal, an L.V.N and employee of LaSalle, told Wrightner she would check his blood pressure during her pill pass. During pill pass, at approximately 10:00 a.m. Gatlin-Deal took Wrightner's blood pressure, which measured high at 160/95.Wrightner had now gone a full week in custody with absolutely none of his medications being provided to him. His blood pressure was very predictably high. According to

the medical file, nurse Gatlin-Deal gave Wrightner a .1 mg tablet of Clonidine, a high blood pressure medication maintained in stock at the jail. Nurse Gatlin-Deal informed Wrightner she couldn't do anything for him. Wrightner reminded Gatlin-Deal again that he had not been receiving his medications since he was booked in a week earlier.

28.     After receiving the Clonidine tablet Wrightner laid down and covered his head with a blanket for about a half hour. When he pulled the blanket from over his eyes he could not see (except very obvious shapes). Wrightner summoned a correctional officer, who reported Wrightner's blindness to the nursing staff. Nothing was done. Shortly thereafter LaSalle supervising Lt. Brian Abbett took Wrightner by wheelchair from his D-Deck cell to the nurses station, where Gatlin-Deal took a blood pressure reading. Again, Wrightner's blood pressure was extremely high. Lt. Abbett informed nurse Gatlin-Deal that Wrightner needed to be taken to the hospital at that time. Nurse Gatlin-Deal responded that she could not do that without approval (eerily reminiscent of other LaSalle nurses' failures to send detainees suffering medical crises to the hospital in past cases before this court). Lt. Abbett emphatically responded by telling nurse Gatlin-Deal to "call whoever you need to call". At that time Gatlin-Deal called LaSalle Director of Nursing/Defendant Ashley Spivey. While on speaker phone, and after being briefed on Wrightner's condition, Spivey instructed Gatlin-Deal to place Wrightner in a holding cell so someone could "observe" him every fifteen minutes.[2] At this point Lt. Abbett put his foot down, refusing to put Wrightner in one of "his" holding cells. Abbett also told both Gatlin-Deal and DON Spivey that Wrightner was not going to die in the jail on his watch. DON Spivey then said "I don't care what he [Abbett] says, put him [Wrightner] in a holding cell. Check his eyes with a light. If his eyes don't respond to light call me back".

_____

[2] This is also eerily reminiscent of LaSalle nurse decisions in other cases before this Court to put detainees experiencing medical crises into a "medical observation" cell, where detainees are not watched closely by either correctional or medical staff.

29.    Nurse Gatlin-Deal then uses a small flashlight to check Wrightner's pupils. They were not responsive to light at all, confirming Wrightner's loss of vision. Nurse Gatlin-Deal stated "Oh my God", then attempted to call DON Spivey repeatedly as previously directed. Spivey did not answer multiple calls from Gatlin-Deal. While waiting on DON Spivey to respond to the medical emergency, Lt. Abbett held Wrightner's eyes open momentarily, further confirming Wrightner had lost his vision. While waiting for DON Spivey to respond to multiple phone calls from Gatlin-Deal, Lt. Abbett again emphatically stated that medical staff needed to get Wrightner out of the jail, and that he was not going to allow Wrightner to die on his watch.

30.    Gatlin-Deal ultimately had Wrightner taken by LaSalle private vehicle to Wadley Regional Medical Center. Medical staff there confirmed he had lost his vision, and that his blood pressure was dangerously high due to not receiving his medications for the past week. Wrightner was placed in ICU, underwent multiple diagnostic tests and was properly medicated. His blood pressure improved once Wrightner actually began receiving medication, but his eyesight did not improve. He was discharged the following evening (October 4, 2020), but not before Wadley medical staff recommended that Wrightner be transferred to a hospital in Tyler, Texas which provided full ophthalmological services (Wadley did not). LaSalle medical and correctional staff refused to do so.

31.    As soon as Wrightner was taken to the hospital on the morning of October 3rd LaSalle staff and medical director Bowman began taking the steps they had deliberately chosen not to take in the seven days since Wrightner was booked in. Specifically, a second request for medications was faxed to Wrightner's providers; Dr. Bowman ordered Wrightner's medications and his medical file was finally updated and a blood monitoring log was finally set up. All of this could

and should have been done on September 26th, and would have prevented Wrightner from losing eyesight due to "complications" from his high blood pressure. Dr. Bowman and nurse Gatlin-Deal documented that Wrightner was placed on the same five medications he was taking before his arrest. No explanation is given in the records as to why all this was not done on September 26th. If LaSalle medical staff had taken any steps to treat Wrightner's accelerated high blood pressure at all between September 26th and October 3rd, his vision loss, physical ailments and hospitalization could have been prevented.

32.     Wrightner was discharged from Wadley on the afternoon of October 4th, 2020 and returned to the jail. But not before a member of the staff at Wadley called the jail to make sure that Wrightner would begin receiving his medications immediately upon his return to the jail. Despite LaSalle's commitment to do so, the refusal to properly medicate and treat Wrightner continued.

33.     His LaSalle medical file indicates that Wrightner was received back into the jail on the evening of October 4, 2020. Despite LaSalle medical's promise to Wadley that it actually begin providing the needed medications to Wrightner, they failed to do so. Within days Wrightner's eyesight began to deteriorate again. He inquired of a least one LaSalle nurse (Shamika Witcher) why he still wasn't receiving medications. She responded "we don't have them yet". Subsequently, as his eyesight began to get blurry again, he asked a guard for a blood pressure check. On this occasion a nurse Witcher gave him a Clonidine tablet, but was careful to tell Wrightner "don't tell anyone-I'm not supposed to give it to you". Yet another example of LaSalle medical staff being pressured, if not outright instructed NOT to treat patients with serious medical conditions. The following day nurse Witcher asked Wrightner if he had gotten his medications, to which he responded "no". Nurse Witcher then gave Wrightner a single Amlodipine pill, which he should have been taking daily.

Wrightner continued to complain that he wasn't getting his medications. He was taken to the nursing station the following day. The day after that he finally (after some two weeks in custody and one hospitalization) began receiving his medications.

34.    Wrightner was released form the jail on November 19, 2020. The charge giving rise to the warrant was ultimately dismissed. He continues to suffer from headaches which occur almost daily, and has decreased vision in both eyes.

35.    Wrightner's diagnoses of several serious medical conditions, including high blood pressure and his daily need for multiple medications to control this and other medical conditions (diabetes and high cholesterol) were immediately made known to LaSalle medical staff during his intake on the morning of September 26, 2020. Yet multiple agents and employees of LaSalle acted with deliberate indifference to those medical needs in violation of their professional standards of care. These corporate agents and employeees had a constitutional and professional duty to act when they became subjectively aware that Wrightner was suffering from serious medical needs. Their failure to do so put him at substantial risk of serious harm and caused or contributed to his unnecessary pain and suffereing and his permanent visual impairment. The acts of these individuals, which include all individual defendants herein, were committed with intent, malice, and/or with reckless disregard for Wrightner's federally protected constitutional rights.

36.    The deliberate indifference to Wrightner's serious medical needs came from each John and Jane Doe defendant. Said defendants were, at all material times, agents and employees of LaSalle, and include all medical personnel on duty at the Bi-State jail and Annex between September 8, 2020 and the conclusion of Wrightner's confinement on November 19, 2020. The identities of these nurses and other lower level providers in the jail are unknown at this time. Each

medical staff employee and agent at the Bi State jail and Annex during Wrightner's confinement also violated his basic constitutional right to be housed in humane conditions of confinement and acted in violation of their professional standards of care.

37.     LaSalle medical staff and providers also acted with deliberate indifference to Wrightner's serious medical needs and in violation of their professional standards of care. The named defendants and other unnamed members of the jail medical staff all knew of Wrightner's medical conditions and his need for daily medications to treat them. They knew Wrightner was not receiving his required and prescribed medications for a full week before Wrightner lost his vision. All of the named and Doe Defendants were personally aware of Wrightner's repeated requests that he receive his medications. Each had a constitutional obligation and professional duty to actually treat and dispense medication to Wrightner but failed to do so.

38.     The stubborn refusal of Director of Nursing Spivey and Nurse Gatlin-Deal to secure advanced medical care for Wrighner, even in the face of Lt. Abbett's demand that he be immediately transported to the hospital is yet another example of LaSalle medical staff's policy, custom and practice of refusing to send desperately ill detainees to the hospital in the face of objective serious medical problems. It also reveals that Wrightner's need for immediate advanced care was obvious even to lay persons.

39.     The lower level nurses named herein - L.P.N/L.V.N.s Brescia, Gatlin-Deal and R.N. Spivey were personally aware of Wrighner's serious medical needs. Yet these medical staff members (and others) failed to follow healthcare protocols, failed to document the medical file, failed to keep honest and accurate medical records, failed to administer essential doses of medication, failed to communicate among one another about their patient, failed to report Wrightner's serious

medical needs to higher-level providers in dereliction of their duties as gatekeepers, failed to monitor Wrightner's blood pressure and failed to arrange for more advanced medical care in a timely manner. Each of them engaged in conduct that knowingly put Wrightner at substantial risk of serious harm, violated their professional standards of caste and caused or contributed to Wrightner's injuries.

40.    Defendant Bowman, as medical director for the Bi-State jail and Annex, failed to timely order Wrightner's medications for a full week after his intake to the jail, failed to adequately communicate with the medical staff concerning Wrightner, failed to supervise the lower level medical providers on staff, failed to monitor and treat Wrightner, even after his return from Wadley Regional Medical Center on October 4, 2020.

41.    The conduct of the individual defendants alleged herein (as well as the conduct of other unnamed individuals) was committed with intent, malice, deliberate indifference, and reckless disregard for Wrightner's federal constitutional rights and caused the damages described in this complaint. The individual defendants (and unnamed individuals described herein) dad a duty to act reasonably, in accordance with the standards of care governing their work. Their conduct described herein constitutes breach of the standard of care and caused Mr. Wrightner harm. The negligent actions of the named defendants and the unnamed employees described herein) constituted a breach of the standard of care and caused Wrightner's injuries and harm.

**B.    <u>Additional Facts Applicable to the Corporate Defendants</u>**

42.    The unconstitutional acts and omissions alleged herein—as well as the inhumane conditions of confinement—were carried out in accordance with the official policies, procedures, practices, and customs of the Corporate Defendants (LaSalle and LaSalle Management). These

corporate policies, procedures, practices, and customs, which are described in more detail below, were the moving force behind the unconstitutional actions that led to Mr. Wrightner's permanent injuries

43.    In the years leading up to 2020, the Corporate Defendants engaged in a pattern, practice, and custom of unconstitutional conduct toward inmates/detainees with serious medical needs, including denying prescription medication, disregarding healthcare protocols that were designed to protect inmates from harm, failing to conduct state-mandated face-to-face checks on inmates, falsifying observation logs, fabricating medical records, failing to monitor inmates in medical observation cells, mismanaging patient medical charts, withholding important information from qualified medical providers, maintaining a deficient medical record-keeping system, ignoring abnormal vital signs, allowing low-level nurses (LVN and LPNs) to practice outside the scope of their medical licenses, failing to conduct essential medical tests and checks, neglecting inmates with chronic medical conditions, downplaying life-threatening symptoms, failing to transport inmates with emergency medical needs to the hospital, and otherwise depriving them of needed medical treatment.

44.    As of the time of Mr. Wrightner's confinement, there had been multiple instances in the Bi-State Jail/Annex (and in other correctional facilities run by the Corporate Defendants) of inmates being systemically denied constitutionally adequate medical care by LaSalle and its agents or employees. Several of these instances involved high-profile lawsuits about which the Corporate Defendants were acutely aware, including those that were covered by local and national media outlets, putting company policymakers on notice that the Bi-State Jail and other LaSalle-run facilities were engaging in practices that endangered the lives of inmates.

45.    For example, in July 2015, 35-year old Michael Sabbie died in the Bi-State Jail because LaSalle ignored his serious medical needs and failed to take him to the hospital—despite his life-threatening medical symptoms. LaSalle staff knew that he suffered from multiple chronic medical conditions, including hypertension, asthma, diabetes, and heart disease. Nevertheless, they failed to give him medication, failed to check his blood pressure and blood sugar, failed to medically monitor him (even after assigning him to a medical observation cell), failed to conduct state-mandated face-to-face checks, failed to communicate his medical needs to qualified medical providers, and failed to summon or secure emergency medical care for him.

46.    In the leadup to Michael Sabbie's death, LaSalle nurses disregarded healthcare protocols, falsified records, and practiced medicine outside the scope of their licenses. Despite his objectively serious medical signs and symptoms, nurses accused him of faking his medical condition. In addition, LaSalle guards fabricated observation logs—suggesting that they were checking on him when, in fact, they were not doing so—and failed to summon emergency medical care, even when he was plainly dying in front of them. Poor training and inadequate staffing caused or contributed to his death. In a lengthy, 169-page report and recommendation to deny LaSalle's motion for summary judgement, United States Magistrate Judge Caroline M. Craven documented overwhelming evidence of systemic constitutional deficiencies at the Bi-State Jail. *See Sabbie v. Southwestern Corr., LLC*, No. 5:17cv113-RWS-CMC, 2019 U.S. Dist. LEXIS 214463 (E.D. Tex., Mar. 6, 2019).

47.    Even after Mr. Sabbie's death and the well-documented evidence of the systemic constitutional deficiencies that caused it, LaSalle did nothing to fix the problems. The company took no steps to correct the nursing staff's failure to follow healthcare protocols and its failure to meet

basic standards of care. Nor did it implement any policy changes to ensure better care for inmates with chronic medical conditions. Incredibly, LaSalle conducted no internal review into the death of Mr. Sabbie. Nothing changed and, predictably, LaSalle's pattern of unconstitutional misconduct persisted.

48.    In July 2016, approximately one year after Michael Sabbie's death, a 20 year old named Morgan Angerbauer died in the Bi-State Jail because LaSalle personnel again failed to follow healthcare protocols, failed to conduct vital medical tests, failed to conduct state-mandated visual checks, failed to monitor her serious medical condition (despite assigning her to a medical observation cell), failed to give her medication for her chronic medical condition, and failed to take her to the hospital despite her plainly life-threatening medical needs. *See Leigh v. Southwest Correctional, LLC.*, No. 5:17cv129. Despite her objectively serious medical condition, LaSalle nurses accused her of faking it. Once again, poor training, inadequate staffing, and other systemic constitutional deficiencies caused or contributed to this inmate's death. As was the case with Michael Sabbie, LaSalle personnel again falsified records to suggest they were conducting state-mandated visual checks. LaSalle's unconstitutional acts and practices continued.

49.    The following year, in November 2017, an inmate named Juan Jose Cordova-Sanchez died in the Bi-State Jail. While being restrained by LaSalle guards on the ground in a prone position, the inmate became unresponsive. Despite this man's obvious and immediate need for emergency medical care, life-saving measures were not undertaken until it was too late to save his life.

50.    In April 2018, a detainee in the Bi-State Jail suffered a stroke. Despite repeated pleas for help by other inmates, trustees, and family members of the stroke victim, LaSalle personnel, including on-duty nurses, disregarded healthcare protocols and failed to provide any treatment or

call an ambulance for approximately 24 hours. Still, LaSalle did nothing to correct the systemic constitutional deficiencies, and the company continued to maintain unconstitutional practices that put inmates at substantial risk of serious harm.

51. Three months later, in July 2018, a Bi-State Jail inmate named William Jones was severely beaten and injured during his confinement. *See Jones v. Southwest Correctional, LLC*, No. 5:19-cv-00104. Despite his life-threatening medical needs, LaSalle staff deprived him of medication, failed to follow healthcare protocols, failed to monitor his serious medical needs, failed to conduct face-to-face checks (while documenting otherwise), and failed to arrange for hospital transport in a timely fashion.[3]

52. Although Mr. Jones was put in a medical observation cell, LaSalle staff conducted virtually no medical monitoring of him. In addition, despite knowing that he suffered from hypertension, LaSalle medical providers took no vital signs—even after he was gravely injured. Nor did they make any effort to provide him with food or water, causing him to suffer from severe dehydration. Instead of arranging for Mr. Jones to be taken to the hospital, LaSalle "released" him to his sister, who had had him transported to the hospital by ambulance. By that time, he was near death's door. He was placed on a ventilator and remained hospitalized for nearly a month. Yet, rather than addressing the constitutional deficiencies that allowed this to happen, LaSalle sought to cover it up by destroying surveillance footage and other relevant information.

53. In March 2019, an inmate named Franklin Greathouse died while in LaSalle's custody at the Bi-State Jail. Although Mr. Greathouse reported having a seizure, he was not seen by a medical doctor or taken to the hospital. LaSalle medical providers accused him of faking it. He

---

[3] The Jones case was tried before a jury in this County in May, 2021. That jury returned a verdict in favor of LaSalle.

died later that same day from a seizure. Once again, state investigators found LaSalle to be out of compliance with jail standards. After his death, an investigation by the Texas Commission on Jail Standards determined that LaSalle guards failed to conduct the requisite face-to-face checks on Mr. Greathouse—while falsely documenting them in their observation logs.

54.    The following month, April of 2019, Holly Austin-Barlow was incarcerated in the Bi-State Jail and Annex. Over the course of two months, LaSalle jail staff failed to provide her prescribed medications necessary to treat her HIV status. She was denied any meaningful treatment for her condition, and was not transferred to a hospital until she was near death. She died in June, 2019. *See Mathis v. Southwestern Correctional, LLC, et al*, No. 5:20CV146.

55.    The above-described incidents occurred prior to Mr. Wrightner's confinement. In each of these instances, LaSalle staff disregarded basic healthcare protocols, deprived inmates of needed medical care, failed to monitor their medical needs, violated state-mandated visual check requirements, and delayed or denied emergency care or hospital transport even when the inmates were obviously suffering from life-threatening medical complications. Despite each of these tragic outcomes, most of which resulted in death, LaSalle failed to correct the unconstitutional policies, practices, and customs that caused them to happen. And, as expected, the systemic constitutional deficiencies continued.

56.    Another citizen died as a result of these same policies, customs and practices simultaneous to Mr. Wrightner's incarceration. Seventy-two year old Larry Raymond Cole was booked into the Bi-State Jail on September 30, 2020. Cole had suffered from a brain tumor years earlier, and his pituitary gland had been surgically removed. He was required to take multiple medications daily to compensate for his lack of a pituitary gland. Both Cole and his wife informed

jail staff, including medical staff, of his critical need for these medications. Cole's wife brought the medications to the jail and discussed them with two LaSalle nurses. LaSalle refused to "approve" Cole's medications. The following day he was found unresponsive in his cell. He died at Wadley Regional Medical Center a few days later due to not receiving his medications.

57.     The unconstitutional policies, practices, and customs described above have not been limited to the Bi-State Jail and have caused unnecessary suffering and deaths in multiple other LaSalle-run Texas facilities. For example, in September 2013, an inmate named Greg McElvy died in the Johnson County Jail, which is operated by LaSalle. Over the course of three days, this inmate exhibited alarming symptoms - he was not eating or drinking; he was vomiting; he lost control of his bodily functions; he was urinating and defecating on himself; and he was suffering from severe respiratory distress. He also had abnormal blood pressure. He repeatedly told jail staff that he was dying and begged for medical attention. Multiple inmates, and one guard, tried to get the LaSalle medical staff to help. However, despite his life-threatening medical needs, he was neither taken to the hospital nor seen by a medical doctor. LaSalle nurses disregarded basic healthcare protocols. By the end of those three days, he was found unresponsive, in a pool of vomit. He died of untreated acute bronchopneumonia and asthmatic complications.

58.     In May 2015, another inmate, Ronald Beesley, died in LaSalle's Johnson County Jail - after complaining of chest pain and experiencing swelling in his limbs. His wife visited him the day before his death. After observing that he could barely walk and was struggling to talk, she and another family member contacted a LaSalle jail official and expressed concern that he would die without immediate medical intervention. However, LaSalle staff did not take him to the hospital or even have him evaluated by a medical doctor. Consequently, Mr. Beesley ended up dying in jail the

following night from an infection in his chest that could have been treated with simple antibiotics. Disregarding healthcare protocols, failing to monitor his medical needs, ignoring his life-threatening medical condition, and refusing to take him to the hospital led directly to Mr. Beesley's unnecessary death.

59.    In November 2015, an inmate named Michael Martinez was found hanging from the ceiling of his cell at the LaSalle-run Jack Harwell Detention Center in Waco, Texas. An investigation revealed that no one had checked on Mr. Martinez in the three hours leading up to when his body was discovered - in violation of state correctional standards. Another inmate, Kristian Culver, died in the same facility seven months later, in May 2016, under similar circumstances. Once again, an investigation revealed that LaSalle guards were not conducting their state-mandated face-to-face checks. Poor training and inadequate staffing also caused or contributed to these deaths.

60.    In 2015-2016, two detainees died in a LaSalle-run jail in McLennan County, Texas. In each instance, LaSalle guards failed to conduct the state-mandated checks and falsified records to suggest their checks had been done. At least one guard admitted that the company had instructed jail staff to falsify inmate observation logs. Similar testimony was elicited in the Michael Sabbie litigation. Poor training and inadequate staffing also caused or contributed to these deaths.

61.    In November 2017, an inmate named Denay Lauren Birnie died in LaSalle's Parker County Jail of a drug-related overdose. Despite her serious medical needs, she was not seen by a medical doctor or taken to the hospital. As with so many others, LaSalle staff failed to monitor her medical condition. An investigation by the Texas Rangers concluded that falsified checks played a role in her death. In December of the following year, an inmate named Andrew DeBusk died in the same facility after being restrained by LaSalle guards. Even when he was nonresponsive and his

face had turned purple and gray, LaSalle guards and a LaSalle nurse ignored his emergency medical needs until it was too late to save his life.

62.    In the years leading up to Mr. Wrightner's confinement, LaSalle-run facilities in Texas routinely failed inspections. According to Brandon Wood, the Executive Director of the Texas Commission on Jail Standards, LaSalle has had "continual noncompliance issues" in Texas, more than other jail operators in the state. In fact, LaSalle-run jails in Texas have been on the state's noncompliance list every year between 2015 and 2019.

63.    LaSalle facilities have also come under scrutiny by state lawmakers for hiring a disproportionate number of "temporarily licensed" corrections officers - taking advantage of a loophole that allowed correctional facilities to hire and staff their jails for up to one year with guards who hadn't gone through the basic correctional training academy. LaSalle did this purely for monetary reasons and without regard for inmate health and welfare. Hiring these untrained guards was cheaper than hiring experienced guards or paying to send them to the corrections academy for their basic training. The Bi-State Jail actively participated in this reckless, profit-driven scheme.

64.    Not only did LaSalle hire a disproportionate number of these temporarily licensed jailers, but it failed to give them state-mandated on-the-job training. Between 2015 and 2019, LaSalle guards engaged in a persistent pattern of falsifying training records. This occurred in multiple LaSalle-run facilities, including the Bi-State Jail. In the Michael Sabbie case, for example, guards testified that LaSalle literally instructed corrections officers to fill out training records indicating that their on-the-job training had been completed, when it had not even begun. Similarly, the Texas Commission on Law Enforcement Standards secured more than a dozen sworn statements from guards at LaSalle's Parker County Jail confirming that they did not receive training that the

company reported to the commission. Guards from other LaSalle-run jails have given similar accounts to investigative journalists.

65.    In the years leading up to Mr. Wrightner's confinement, LaSalle had a well-documented practice of failing to adequately train its security personnel on recognizing and responding to the serious medical needs of inmates and detainees. The need for this training was obvious because LaSalle often hired detention staff with little or no corrections experience, and it was foreseeable that the lack of such training would cause harm to inmates and detainees. In fact, the inadequate training of LaSalle jail guards caused or contributed to multiple bad outcomes in the Bi-State Jail prior to Mr. Wrightner's confinement. In litigation involving both the death of Michael Sabbie and the death of Morgan Angerbauer, for example, multiple corrections officers testified that LaSalle did not even train them that they had a constitutional duty to summon medical care for inmates with serious medical needs. These same training deficiencies played a substantial role in Mr. Wrightner's unnecessary suffering.

66.    The inadequate training was not limited to jail guards. LaSalle also failed to train its jail nursing staff on how to recognize and respond to the serious medical needs of inmates, follow healthcare protocols, monitor inmates in medical observation cells, conduct medical examinations in accordance with basic standards of care, notify qualified providers of abnormal findings, consult with and involve medical doctors in patient care, correctly maintain and review medical charts, and contact emergency services in a timely fashion. The need for this training was obvious, particularly in the Bi-State Jail, because there is no doctor on site and because the jail utilizes lower-level nurses (LVNs and LPNs) in inmate-patient care. Indeed, despite their limited scope of license, these LVN/LPNs are often the only ones providing healthcare at the Bi-State Jail.

67.    It was foreseeable that the training deficiencies outlined above would cause harm to inmates and detainees, such as Mr. Wrightner. In fact, just as the inadequate training of jail guards caused or contributed to multiple bad outcomes in the Bi-State Jail prior to Mr. Wrightner's confinement, so, too, did the inadequate training of LaSalle LPN/LVNs. In litigation involving both the death of Michael Sabbie and the death of Morgan Angerbauer, for instance, several LaSalle LVN/LPNs testified that they received little to no training and were not even aware of the corporation's healthcare protocols. These same training deficiencies played a substantial role in causing Mr. Wrightner's injuries.

68.    In addition to its inadequate training, the practice of insufficient staffing has been a well-documented and persistent problem at LaSalle-run Texas jails. In fact, staffing shortages led to several of the constitutionally deficient practices outlined above. For example, one of the reasons why LaSalle guards routinely fail to monitor detainees and conduct their state-mandated checks is because there are not enough of them to do the job. Likewise, staffing shortages play a role in nurses failing to check vital signs and disregarding time-consuming medical protocols. It is also one of the reasons why LaSalle fails to take inmates to the hospital, even when they are suffering from life-threatening medical needs. When an inmate is taken to the hospital, it requires a guard to be posted by the inmate's room. If the jail has staffing shortages, it cannot afford to lose the manpower it would lose if an inmate is hospitalized. Insufficient staffing practices at the Bi-State Jail and other LaSalle-run facilities caused harm to multiple inmates in the years leading up to Mr. Wrightner's confinement, and such practices played a substantial role in causing his injuries. LaSalle once again did so by not following the recommendation of Wadley doctors that Mr. Wrightner be transported to a hospital with opthamalogical services.

69.    One of the most glaring systemic deficiencies is LaSalle's medical observation policy, which is plainly unconstitutional as implemented. When LaSalle identifies an inmate with serious medical needs, the corporate policy is to place the inmate in a medical observation cell. In theory, this is appropriate. However, when LaSalle places an inmate on medical observation, zero medical monitoring takes place. Instead, corrections officers with no medical training or experience are put in charge of monitoring them. And their so-called medical monitoring consists of guards quickly peeking in the cells—often while walking by without stopping. They are not trained to look for abnormal signs or symptoms, ask questions of the inmates, carefully examine them, or document any observations. Instead, they are told not to summon care so long as the inmates were alive and breathing. And because of LaSalle's persistent understaffing problems, guards routinely fail to conduct even these perfunctory checks. LaSalle's "medical observation" policy led to disastrous results in the case of Michael Sabbie, Morgan Angerbauer, William Jones, Holly Barlow-Austin, Raymond Larry Cole and others. Despite these negative outcomes, the company made no effort to correct this plainly unconstitutional policy, and, predictably, Albert Wrightner became its latest victim.

70.    LaSalle also has a longstanding practice of denying medication and medical care to sick or injured inmates based on their alleged "refusal" to receive the medicine or care. Yet, in many instances, the inmates are too hurt or ill to physically get up to receive the medication or medical care. Moreover, LaSalle has a longstanding practice and corporate culture of treating inmates as "fakers," accusing them of feigning illness or distress when they report medical problems, and assuming all inmates fit into this description—even when they are displaying objectively abnormal vital signs and symptoms. Each of these longstanding practices predictably caused harm to inmates

in the years leading up to Mr. Wrightner's confinement, and each of them played a substantial role in causing his injuries.

71.    Additionally, LaSalle-run facilities have a longstanding practice of poor medical record-keeping and miscommunication among jail medical providers. This has been a major problem at the Bi-State Jail—where medical records are routinely lost, and communication breakdowns are commonplace. Lower-level nurses often fail to convey important information about patient-inmate care needs to one another and to higher-level providers. These practices predictably put inmates at substantial risk of serious harm. They, in fact, contributed to negative outcomes for multiple inmates, including Michael Sabbie, Morgan Angerbauer, William Jones, Holly Barlow-Austin and Raymond Larry Cole, and they played a substantial role in Mr. Wrightner's constitutionally deficient care and negligent treatment.

72.    As was the case with other inmates who died in LaSalle-run facilities, the failure to provide and secure needed medical care for Mr. Wrightner was motivated, in part, by constitutionally impermissible profit-driven reasons. The Corporate Defendants had a practice of submitting unrealistically low bids to get jail contracts. After securing the contracts, they would then cut costs, or keep their budgets unrealistically low, to make money. This included hiring inexperienced jail guards and lower-level nurses and failing to invest in adequate training. It also included spending inadequate amounts on correctional medical care and habitually understaffing its facilities. It was foreseeable that LaSalle's inadequate training, insufficient medical spending, and understaffing would cause harm to inmates and detainees in need of medical care. In fact, these reckless profit-driven practices resulted in substantial harm to multiple inmates in the years leading up to Mr. Wrightner's confinement. And these same unconstitutional and negligent practices caused

his injuries.

73.    The Corporate Defendants and their employees and agents had a duty to treat Mr. Wrightner in accordance with the applicable constitutional, medical, and correctional standards of care. The Corporate Defendants breached those duties, and Mr. Wrightner's damages, including his pain and suffering, were the direct and foreseeable result of the unconstitutional and negligent actions and inactions alleged herein. The Corporate Defendants are liable for their own negligent actions and for the negligent actions of their employees and agents described herein.

74.    The corporate policies, practices, and customs described above were the moving force behind Mr. Wrightner's injuries and the constitutional violations alleged herein. The Corporate Defendants also ratified the unconstitutional conduct of its employees and agents in connection with the Mr. Wrightner's injuries. LaSalle policymakers were aware of his condition and participated in the decision not to order and deliver his medications as ordered by his treating doctors. In addition, following Mr. Wrightner's loss of eyesight, LaSalle engaged in deceptive actions to cover up what happened. This included altering and/or modifying portions of Mr. Wrightner's medical file.

75.    All acts and omissions committed by the Corporate Defendants and their employees and agents were committed in violation of applicable standards of care and with intent, malice, deliberate indifference, and/or with reckless disregard for Mr. Wrightner's federal constitutional rights. And the acts of and omissions of the Corporate Defendants caused the damages alleged herein.

76.    Moreover, the conditions in which LaSalle confined Albert Wrightner were inhumane in the extreme, beyond all bounds of human decency, in flagrant violation of his constitutional rights, and gross breach of the applicable standards of care. Housing him in such deplorable

conditions was arbitrary, purposeless, unreasonable, and bore no reasonable relationship to any legitimate penological or government objective. This caused Mr. Wrightner substantial harm in the form of unnecessary suffering.

**C.**    **Additional Facts Applicable to Bowie County**

77.    Defendant Bowie County delegated its final policy-making authority to the Corporate Defendants. Despite this, Bowie County had a continuing duty to ensure that its corporate policymakers were meeting the constitutional needs of its detainees. Bowie County adopted and ratified the policies, customs, and practices of the Corporate Defendants as its own. As such, Defendant Bowie County is liable for any unconstitutional corporate policies, customs, or practices that resulted in harm to any detainees and inmates confined in the jail, including the those that caused the injuries to Albert Wrightner. It was foreseeable that such policies, customs, and practices would put the lives of Bi-State Jail and detainees at risk, and such policies and customs caused and/or substantially contributed to the injuries sustained by Albert Wrightner.

78.    Bowie County is also liable for failing to regularly inspect the Bi-State Jail to ensure that LaSalle was meeting its constitutional obligations. Given the highly publicized evidence of how inmates were being treated, including those who died in the years leading up to 2020, Bowie County was on notice that LaSalle was not complying with minimal constitutional standards. It had a constitutional duty to remedy the situation, and it breached its duty.

**V.**
**CAUSES OF ACTION**

**A.**    **Against the Corporate Defendants**

**1.**    **42 U.S.C. § 1983**

79.    Based on the allegations in this complaint, the Corporate Defendants (LaSalle and LaSalle Management) are liable under 42 U.S.C. § 1983 for violating the Plaintiff's rights under the Eighth and Fourteenth Amendments to the United States Constitution. This includes depriving Mr. Wrightner of constitutional rights to adequate medical care and to be housed in humane conditions of confinement.

### 2.    Negligence

80.    The Corporate Defendants are liable under Arkansas and/or Texas law for their own negligent conduct and for the negligent conduct of their employees and agents, whether named or unnamed in this Complaint.

## B.    Against Bowie County

81.    Based on the allegations in this complaint, Bowie County is liable under 42 U.S.C. § 1983 for violating the Plaintiff's rights under the Eighth and Fourteenth Amendments to the United States Constitution. This includes depriving Wrightner of his constitutional rights to adequate medical care and to be housed in humane conditions of confinement.

## C.    Against the Individual Defendants

### 1.    42 U.S.C. § 1983

82.    Based on the allegations in this complaint, all individual defendants are liable under 42 U.S.C. § 1983 for violating Plaintiff's rights under the Eighth and Fourteenth Amendments to the United States Constitution. This includes depriving Wrightner of his constitutional rights to adequate medical care and to be housed in humane conditions of confinement.

83.    Individual liability under 42 U.S.C. § 1983 also extends to the supervisory Defendants identified herein, including Defendants Bowman and Spivey for their failure to oversee

their subordinates and ensure compliance with correctional standards of care as described herein.

84.    Based on the allegations in this complaint, the individual defendants are liable under the laws of Texas and/or Arkansas for violating their applicable standards of care and negligently causing injuries and damages to Wrightner as set forth hereinafter.

## VI.
## DAMAGES

85.    Plaintiff was 41 years of age at the time of his confinement. As a direct and proximate result of Defendants' conduct, Plaintiff has sustained the following damages:

a.    Medical expenses in the past;

b.    Future medical expenses;

c.    Past and future pain, suffering and mental anguish;

d.    Loss of earnings;

e.    Loss of earning capacity; and

f.    Permanent impairment in the form of loss of vision.

## VII.
## PUNITIVE DAMAGES

86.    Defendants knew, or should have known in light of the surrounding circumstances, that their conduct would naturally and probably result in injury and yet continued such conduct with reckless disregard of the consequences from which malice may be inferred. Defendants intentionally pursued a course of conduct for the purpose of causing injury. Accordingly, Plaintiff seeks an award of punitive damages against the LaSalle Defendants and Individual Defendants.

## VIII.
## ATTORNEY'S FEES

87.    It has become necessary for Plaintiff to retain the services of the undersigned attorney

to prosecute the claims asserted herein. Accordingly, Plaintiff request that the Court award him reasonable and necessary attorney's fees incurred in the prosecution of this action.

## IX.
## DECLARATORY RELIEF

88.    Plaintiff seeks a declaratory judgment from the Court concerning Plaintiff's rights and Defendants' liability established by the United States Constitution and federal and state statutes and law referenced herein. Specifically, Plaintiff requests this Court to declare that the Municipal defendant, Bowie County, Texas have non-delegate duties to operate the Bi-State Jail and Annex in a manner that complies with the constitutional and statutory requirements set forth above; and that the Municipal Defendant is therefore liable to Plaintiff for damages sustained as a result of actionable conduct on the part of the non-municipal Defendants as described herein.

## X.
## PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court award him the following relief:

a.    Medical expenses in the past;

b.    Future medical expenses;

c.    Past and future pain, suffering and mental anguish;

d.    Loss of earnings;

e.    Loss of earning capacity;

f.    Permanent impairment in the form of loss of vision;

g.    Punitive damages against the LaSalle and Individual Defendants;

h.    Declaratory relief as set forth herein above;

i.    Attorney's fees and costs;

j.      Pre-judgment interest as appropriate; and

k.      Any such other and further relief as this Court deems just and equitable.

September 26, 2022

Respectfully submitted,

*/s/ W. David Carter*

_____

W. David Carter
Texas State Bar No. 03932780
MERCY ✶ CARTER, L.L.P.
1724 Galleria Oaks Drive
Texarkana, Texas 75503
Telephone: (903) 794-9419
Fax.: (903) 794-1268
wdcarter@texarkanalawyers.com

ATTORNEYS FOR PLAINTIFF
ALBERT WRIGHTNER